Fuchsberg, J.
(concurring). Defendant, an employee of the Poughkeepsie Plaza Pharmacy, was charged with selling a ceramic coin bank for $1.03 on Sunday in violation of the provisions of section 9 of the General Business Law. He challenges his conviction on the grounds that this "Sabbath Law” (General Business Law, § 2) is violative of equal protection principles contained in both the State and Federal Constitutions (NY Const, art I, § 11; US Const, 14th Arndt) and, as presently written, is void for vagueness.[1]
Less than a year ago, we were asked to decide this same equal protection question. While three of us were prepared to reach the constitutional question at that time, two other members of the court believed it sufficient, in the context of that case, to reverse the conviction on the ground that it had resulted from discriminatory enforcement (People v Acme Markets, 37 NY2d 326). Now, however, we are squarely presented with the constitutionality of the statute itself. Because my colleagues, who, like myself, find section 9 unconstitutional today, would leave intact other portions of article 2 *289 which I believe are inextricably intertwined with section 9, I have set forth my views separately.
I begin by noting, as pointed out in the Acme Markets case, that "[t]he entire court is in agreement that the statute in question does not transgress the prohibition against establishment of religion” (37 NY2d, at p 333 [concurring opn of Judge Wachtler]). The focus here, instead, as in Acme, is on the question of whether the distinctions drawn by the statute between activities which may be conducted on Sunday and those which may not are rational ones, for, if they are not, they are violative of equal protection principles.
Nevertheless, it is helpful to this analysis to recognize that we are dealing with a statute which, while it has presently the secular purpose to regulate the health and welfare of citizens under the police power of the State, is indisputably derived from older enactments designed to further the religious nature of the Sabbath (see People v Acme Markets, supra, at p 332; People v L. A. Witherill, Inc., 29 NY2d 446, 449; People v Friedman, 302 NY 75, 79-80; People v Dunford, 207 NY 17; People v Havnor, 149 NY 195; People v Moses, 140 NY 214; Merritt v Earle, 29 NY 115; McGowan v Maryland, 366 US 420, 431-451).
As the United States Supreme Court explained in McGowan v Maryland (supra), the substitution of a permissible concern for the general welfare for the earlier concern that the religious nature of the day be fully observed came about gradually as a result of a process of modification and accretion (366 US, at p 434). That court found the history of these changes to be strong evidence that Sabbath Laws throughout the country presently have a secular and not a religious purpose (at p 444; see, also, People v Acme Markets, supra, at p 333). So, in New York, for example, the use of such terms as "desecration” of the "Christian Sabbath” to describe breaches of the Sabbath peace caused by fishing on a private pond (People v Moses, 140 NY 214, 215, supra) have dropped from sight, replaced by legislative concern with the recreational merits of exceptions such as ones pertaining to the sale of fishing tackle and beer, art and antiques, or, most recently, thoroughbred horses at auction (L 1975, ch 759, § 1).
While that history demonstrates that no impermissible taint of establishment of religion clings to the statute, it also proves that the statute is not the product of a single, conceptually cohesive legislative plan, but, instead, the consequence of *290 years of patching and filling by the Legislature as it attempted to keep up with rapidly changing societal patterns and needs. Under such circumstances, it was almost inevitable that a time would come when the patchwork no longer made any sense. I share my brother Judges’ view that that moment has arrived. For the statute in its present form creates distinctions which can only be described as irrational, precisely the conclusion reached by those of us who joined in the concurring opinion in Acme Markets (37 NY2d, at pp 333-334). I find it desirable, however, to set forth here, somewhat more fully than was appropriate in the context of the Acme Markets decision, the legal basis upon which I believe it must be found that the statute violates equal protection principles.
Of course, unless classifications created by statute impinge upon some fundamental right or rest upon suspect criteria (Alevy v Downstate Med. Center of State of N. Y., 39 NY2d 326, 332-333; Matter of Malpica-Orsini, 36 NY2d 568) they must be upheld if they rest upon a rational basis. Distinctions among items which may be sold on Sunday and items which may not, though made in pursuit of the public health and welfare rather than on purely economic grounds, thus appear to be subject to this less stringent test of rationality.
But rationality in this context is not easy to define. As the United States Supreme Court noted in McGowan, "[t]he problem of legislative classification is a perennial one, admitting of no doctrinaire definition” (366 US, at p 426, n 3, citing Tigner v Texas, 310 US 141). More helpfully, the court there stated that: "Although no precise formula has been developed, the Court has'held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classiñcation rests on grounds wholly irrelevant to the achievement of the State’s objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.” (McGowan v Maryland, supra, at pp 425-426 [emphasis added].)
The test is thus not whether a court, by an unfettered exercise of its imagination, can dream up circumstances which might justify the classifications, but, rather, whether the *291 Legislature’s own goals are reasonably furthered by the classes it created.
As the court also pointed out in McGowan, the fact that a statutory classification system has been developed in a piecemeal fashion is not itself fatal to its rationality (at p 426). Nevertheless, the development of classifications by gradual accretion and not by comprehensive planning, particularly when accompanied by shifts in basic legislative purpose, opens up possibilities for the introduction of irrational distinctions in ways less likely to occur when a statute is designed in toto at one time. Courts may find in such circumstances confirmation of their judgments that things have gone beyond the bounds of reasonableness.
So it is with section 9 of the General Business Law. The statute, which began as a general prohibition upon sales of goods of all kinds (see former Penal Code, § 267), presently makes it possible, for instance, to buy beer, but not cooked meals, for home consumption (§ 9, subds 2, 6); to eat meals in a restaurant but not to drink therein; to purchase a thoroughbred horse at public auction but not to buy a less distinguished animal (§ 9, subd 7); to buy books at a newsstand but not in a bookstore (People v Corpora, 15 NY2d 702); to buy skis but not ski wax, gasoline but not a battery, and, as in the case before us, to purchase drugs and medicines in a drugstore but not to purchase most of the many other products sold in that same store, often on the very same counter (People v Genovese, 24 NY2d 917; People v Utica Daw’s Drug Co., 16 AD2d 12).
It is impossible to conceive of any reasonable state of facts which could explain how the avowed legislative purpose to provide a day of rest and recreation for all citizens (General Business Law, § 2; People v Dunford, 207 NY 17, supra; People v Friedman, 302 NY 75, supra) is furthered by such distinctions.[2] It is difficult to see how such classifications are related *292 to the promotion of rest or recreation or even of "religious liberty” (General Business Law, § 2). It is apparent that they are, rather, a hodgepodge of unrelated exceptions legislated at the instance of whichever interest groups were best able to bring their views to the Legislature’s attention (see, for example, the concurring opn of Mr. Justice Frankfurter in McGowan v Maryland, supra, at p 535; Pfeifer, Church, State, and Freedom, pp 233-234). That such lobbying was their privilege as citizens does not serve to provide the resulting patchwork with a functional relationship to the stated legislative purpose. Instead, it reinforces our conclusion that the complexity of modern society’s increasingly varied pursuits of rest and recreation has utterly outstripped the original statute, forcing the Legislature to accommodate these developments haphazardly as particularly pressing needs were called to its attention. In short, the present statute no longer "responds to the practical living facts with which it deals” (McGowan v Maryland, supra, at p 524).
Moreover, although this particular defendant’s conviction was based on section 9 of the Sabbath Laws, which is concerned with the sale of goods, I believe that our attention ought not to be confined to that section of the law alone, for "in order properly to consider * * * the broad constitutional contentions, we must examine the whole body of * * * [New York’s] Sunday laws” (336 US, at p 423). Inasmuch as other parts of those laws are integrally related to section 9, our holding today inevitably has consequences which will permeate interpretations of those other parts as well.
Not all of the sections of the statutes are so intertwined. Some of them, such as those which regulate sports events, parades, service of process or entertainment presentations,[3] *293 are sufficiently unrelated to the commercial interests involved in selling goods so that, at least for the purpose of deciding the case before us, whatever internal inconsistencies there may be in these sections should be left for examination at another time. But three of the sections subsumed under the rubric of Sabbath Laws are unavoidably interrelated. These are section 9, which has already been discussed, and sections 5 and 8, which, respectively, prohibit all "labor” on Sunday except that which is "needful during the day for the good order, health or comfort of the community” and all "trades, manufactures, agricultural or mechanical employments” except those which are "works of necessity” which can be performed without disturbing the repose of the community.* **[4]
The interrelationship does not stem from the history of the three sections. Indeed, although, as the majority points out, the seeds of all three sections can be found in a single early enactment (Laws of New York, 1785-1788, ch 42) their subsequent separation and development has proceeded by modification and evolution and without any noticeable effort on the part of the Legislature to co-ordinate them (Pfeifer, Church, State, and Freedom, pp 227-237). Their present interrelationship derives instead from the fact that the society which they attempt to regulate has changed so drastically since each section was first conceived that the traditional lines of demarcation that at one time may have separated "labor”, "trades”, and "sales” have, for all practical purposes, vanished beyond *294 recall. (See Changes in the Occupational Structure of US Jobs, Monthly Labor Review [US Bureau of Labor Statistics], March, 1975, pp 24-34; Employment Outlook for Tomorrow’s Job, Bureau of Labor Statistics: Occupational Outlook Handbook [1974-1975 ed]; Occupational Outlook for the Mid-Eighties, Occupational Outlook Quarterly, vol 18, No. 4 [Winter, 1974].)
Case law developed under sections 5 and 8 thus exhibits the same sort of schizophrenia that the statutory exceptions listed in section 9 display. Indeed, since the former two sections contain no express list of exceptions, but only permission to do what is "necessary”, the list of exceptions has simply developed by way of case law instead of by legislative fiat. However justified each exception may have appeared to be at the time each was made, viewed collectively from our present perspective, they suffer from the same kind of irrationality which characterizes section 9.
Cases which have tried to wrestle with the status of the modern automatic, coin-operated laundry under the Sabbath Laws tell the story well. Reading them, we learn that the operation of such a laundry is not a prohibited sale under section 9 (People v Gwyer, 7 AD2d 711), but is the practice of a trade not "necessary” on Sunday (People v Kaplan, 8 AD2d 163). Further, this is so even when the proprietor of such an establishment does not work on Sunday, but merely leaves the front doors open from Saturday night to Monday morning.
In contrast, while attendants required to be present by law in New York City in automatic laundromats after 6:00 p.m. are performing "labor” in violation of section 5, the operation of the laundromat without them would be permitted under that section so long as the proprietor does not do any work on the premises himself (Schacht v City of New York, 40 Misc 2d 303, affd 27 AD2d 987). As the dissenting opinion in the Kaplan case pointed out, it is "an obvious fact [that] no Legislature has ever considered the problem [of automated laundries] in the context of the Sunday laws” (8 AD2d, at p 168 [dissenting opn of then Justice now Chief Judge Breitel]). (See, also, People v Rubenstein, 17 Misc 2d 10; People v Aliprantis, 8 AD2d 276; People v Welt, 14 Misc 2d 275; People v Andob Corp., 25 Misc 2d 542; Jiffy Auto Laundry v Monaghan, 118 NYS2d 189 [all cases involving automatic laundries brought under various sections of the statute].)
Confusions among the definitions of selling, of trade, and of *295 labor have abounded as have inconsistent definitions of each of those terms themselves. So "labor” has been defined as not being limited to menial work (People v Polar Vent of Amer., 10 Misc 2d 378, affd 4 NY2d 954). In the Polar Vent case, employees who did no other work than display wares and solicit sales from customers on Sunday in a showroom were held to be in violation of section 5, and the same holding was applied to sales in a showroom of homes which could be built upon the customer’s land (People v Federal Bldrs. & Home Modernization Corp., 65 Misc 2d 407); on the other hand, a real estate salesman who did the same thing has been held exempt from prosecution because the sale of real estate was not intended to be covered by the prohibition upon sale of goods in the predecessor to section 9 (People v Dunford, 207 NY 17, supra), and no suggestion has ever been made, to our knowledge, that such sales of realty might violate the labor section of the statute. Thus one may purchase a house on Sunday if it is already attached to land, but otherwise not. A senior accountant supervising a team of auditors has been held innocent of violating section 5 (People v Sacks, 2 Misc 2d 201) because his work was entirely mental; on the other hand, the supervisor of men working in a factory was convicted even though he proved that he did no physical labor but only mental work (People v Adler, 174 App Div 301). The operation of a travel bureau is not violative of section 5 (Matter of Haroche v Leary, 64 Misc 2d 191); again on the other hand, it is. the "’business one practices or the work in which one engages regularly’” which was the rationale on which the operation of the automatic laundry by an absent proprietor was held violative of section 8 in People v Kaplan (8 AD2d 163, 164, supra).
Manifestly, then, the persistent pattern of inconsistencies infiltrates all three' sections and creates a crazyquilt of irrationalities that cross over from each section to the others as well. Thus, it is not at all clear that section 9, at least insofar as it creates specific exceptions for certain kinds of sales of goods, has not constituted a barrier to prosecutions under sections 5 or 8 for the same sales, certainly to the extent that those activities also involve labor or trade, a blending almost impossible to avoid as "blue collar” and "white collar” distinctions blur into the all-enveloping and amorphous category of service worker. Since courts’ ability to enforce the latter sections has proved to be no more consistent or rational than *296 was the Legislature’s ability to amend section 9 rationally, the invalidation of section 9 would leave the hopeless task of deciding which of the sales formerly authorized by that section are forbidden under the rubrics of labor or trade.
If section 9 alone were invalidated, would the sale by the roadside of the fruits of the farm then be "agricultural employment” under section 8? Would the sale of such a confection as the soft ice cream poured into cones as it comes out of the front of a machine be "manufacture” within section 8 when an employee standing in back of it puts the raw ingredients into the other end? Is ice cream "necessary” to our rest and recreation? Are beer, magazines, thoroughbred horses, souvenirs, cemetery monuments, and fishing tackle—now all permitted sales exceptions under section 9—then to be considered "necessary” on Sunday? Perhaps the closest any court in this State has come to a definition of what is "necessary” for the good order of society on Sunday is the statement made over a century ago that necessity must be determined on a case-by-case basis (Landers v Staten Is. R. R. Co., 13 Abb Prac [NS] 338). The ability to make the distinctions among activities required by the word "necessity” does not seem to have improved with the passage of time. The escalating changes in society certainly have not helped.
In sum, the omnipresence of commercial activities which cannot be isolated neatly within the strict confines of any one of sections 5, 8, or 9 is such that, realistically viewed, the three sections do not lend themselves to practical severance from one another. Experience with them demonstrates that the three are so interwoven that, if sections 5 and 8 were left standing alone, they would continue to spawn and proliferate the very kind of problems which are now produced by the three sections together. (See McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, p 328.) Therefore, I would hold not only that section 9 (and of course § 12) is unconstitutional but that sections 5 and 8 should fall with it, for, unless we declare all three invalid, the net result of our decision will be illusory, accomplishing in the main no more than the substitution of section 5 or section 8 for section 9 in summons or appearance tickets which initiate most criminal prosecutions under article 2 of the General Business Law.
Accordingly, on that broader basis, I would reverse the order of the Appellate Term and dismiss the information.
*297 Chief Judge Breitel and Judges Jasen, Gabrielli, Jones and Cooke concur with Judge Wachtler; Judge Fuchsberg concurs in a separate opinion.
Order reversed and the information dismissed.

. Because I would reverse here on equal protection grounds, I do not reach defendant’s assertion of vagueness save to note that we have, albeit in somewhat equivocal terms, rejected a similar challenge to section 9 based on vagueness in the recent past (People v Weston’s Shoppers City, 30 NY2d 572). I do, however, concur in today’s holding that the forfeitures provided for in section 12 are fatally ambiguous and the section must therefore be declared invalid.

. Cases in the many courts in other States, which, having been confronted with statutes containing similar accretions of prohibitions and exceptions, have reached this same conclusion include Denver v Bach (26 Col 530), Allen v Colorado Springs (101 Col 498), Elliot v State (29 Ariz 389), City of Mt. Vernon v Julian (369 Ill 447), Gronlund v Salt Lake City (113 Utah 284), City of Springfield v Smith (322 Mo 1129), Bocci & Sons Co. v Lawndale (108 Cal 720), Matter of Ferguson (62 Okla Crim 145), Deese v City of Lodi (21 Cal App 2d 631), Henderson v Antonacci (62 So 2d 5 [Fla]), Kelly v Blackburn (95 So 2d 260 [Fla]), Auto-Rite Supply Co. v Mayor (41 NJ Super 303, affd on other grounds 25 NJ 188), Chan Sing v City of Astoria (79 Ore 411) and Broadbent v Gibson (105 Utah 53).

. Section 7 of the General Business Law prohibits "All public sports, exercises or shows, except professional golf tournaments * * * and all noise unreasonably disturbing the peace of the day” conducted for "the entertainment of spectators” on Sundays, unless a local government exercises its option to permit such activities after 1:05 p.m. It permits all sports, games or recreational activities engaged in for personal enjoyment so long as these do not "constitute a serious interruption of the repose or religious liberty of the community.”
Section 11 of that law forbids service of process on Sunday except in criminal proceedings or where otherwise authorized by statute. Section 13 provides penalties for malicious service of process on Saturdays on those who observe that day as their Sabbath.
Section 14 forbids "All processions and parades on Sunday in any city” save funeral or religious processions, and forbids all noise or music connected with the latter except that military salutes or military music is permitted at any time of day at the *293 funeral of a serviceman or member of a secret fraternal society and after 1:00 p.m. at a religious ceremony. The general prohibition may be relaxed by local law after 2:00 P.M.
Section 15 prohibits "All legitimate theatrical performances, concert and recital dances, motion picture exhibitions, or other public exhibitions, exhibits, shows or entertainment” except where local law permits these after 1:05 p.m. It also provides that if such performances were the custom in a locality prior to the passage of section 15, they are permitted to continue unless subsequently prohibited by local law.

. Section 5 of the General Business Law reads: "All labor on Sunday is prohibited, excepting the works of necessity and charity. In works of necessity or charity is included whatever is needful during the day for the good order, health or comfort of the community.”
Section 8 of the General Business Law reads: "All trades, manufacturers [sic], agricultural or mechanical employments upon the first day of the week are prohibited, except that when the same are works of necessity they may be performed on that day in their usual and orderly manner, so as not to interfere with the repose and religious liberty of the community.”
The use of the word "manufacturers” instead of "manufactures” appears to have been inadvertent (McKinney’s Cons Laws of NY, Book 19, General Business Law, § 8, nl).