562

EDWARD GARY REISDORF, JOSEPH J. STYPA, DAVID A. WALSH AND JOSEPH J. McMAHON, PLAINTIFFS, v. MAYOR AND COUNCIL OF THE BOROUGH OF MOUNTAINSIDE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided April 27, 1971.

*Mr. Robert H. Jaffee* for plaintiffs (*Messrs. Reisdorf & Jaffe,* attorneys).

*Mr. Murray Staub* for defendants (*Messrs. Irwin, Post & Staub,* attorneys).

FELLER, J. S. C. This is an action in lieu of prerogative writs. Plaintiffs move for summary judgment and defendants have filed a cross-motion for summary judgment. Counsel agree that there is no genuine issue of fact involved.

With reference to the specific questions raised under the statutes, there have not been many court decisions construing and interpreting these statutes on these particular questions. Thus it has been necessary to resort to court decisions involving similar situations, and to resort to the definition of words and phrases used in the statutes, as well as other factors in an attempt to interpret the same.

Plaintiffs contend that on February 16, 1971 defendant enacted an ordinance known as Ordinance No. 438–71; entitled "An Ordinance to Amend Ordinance No. 257–58 and

to Provide for the Establishment of New Election Districts and the Location of said Election Districts within the Borough of Mountainside."

Public notice that the ordinance was passed after second reading and notice of public hearing given by publication of the ordinance in the *Mountainside Echo* on February 18, 1971. The publication did not include a copy of the redistricting map and no prior publication of such map was made.

Plaintiffs further contend that prior to the redistricting, the number of registered voters in the five districts of Mountainside were as follows: 681 voters in the First, 1,166 in the Second, 582 in the Third, 964 in the Fourth, and 937 voters in the Fifth District. In the First and Third Districts there was one voting machine utilized during the election, and in the Second, Fourth and Fifth Districts two.

Plaintiffs state that it is also important to note that the number of registered voters and the number of ballots cast in each of the five districts has not increased in any significant manner in the last five years. They contend that defendants had no authority to enact the Ordinance under *N. J. S. A.* 19:4–6 and 19:4–7. Plaintiffs state that *N. J. S. A.* 19:51–1 is applicable, that defendants violated its provisions, and there was not proper publication of the ordinance; that the map was not set out in the body of the ordinance but only referred to and was advertised in the same way.

Defendants contend that because of a substantial increase in population in Mountainside since 1958 when the election districts were established, and because that increase resulted in a serious differential between the number of voters in the districts, the borough council determined that it would be in the best interests of the voters to readjust and subdivide the election districts. At the time of such determination the borough was divided into five election districts, three of which were districts in which more than 600 votes had been cast in the last two general elections. Ordinance No. 438–71, which provided for the establishment of new

election districts and their location, divided the borough into ten election districts, none of which contained more than 550 or less than 350 registered voters. In adopting the ordinance the readjustment will not require that the Union County Board of Elections, which supplies the borough with voting machines, purchase any new machines, nor will there be any more than a nominal additional expense to such board (if there is any additional expense at all) for election workers.

Defendants contend that *N. J. S. A.* 19:51–1 is not applicable; that the ordinance represented a proper exercise of power under *N. J. S. A.* 19:4–6 and 19:4–7, and that the ordinance was properly published when it referred to the map on file in the office of the borough clerk.

Plaintiffs contend that the action of the mayor and borough council violates *N. J. S. A.* 19:51–1. This statute provides that election districts in which voting machines are to be used may be altered, divided or combined by the county board of elections so as to provide that each district in which one machine is to be used shall contain, as nearly as may be, 750 registered voters; districts with two machines approximately 1,000, and districts with three machines approximately 1,500 registered voters. The statute provides that nothing contained therein shall prevent any election district from containing a lesser number if necessary for the convenience of voters, but this must be determined by the county board of elections. It is therefore evident that this statute alone does not permit the readjustment of election district boundary lines by the local governing body when there are voting machines.

In considering this case it must be remembered that *N. J. Const.* (1947), *Art.* IV, *sec.* 7, *par.* 11, provides, that any law concerning municipal corporations formed for local government shall be liberally construed in their favor, and the powers of such municipal corporations include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly con-

ferred or essential thereto, and not inconsistent with or prohibited by the State Constitution or by law.

▮ Courts are enjoined by our Constitution and Home Rule Act to interpret statutes liberally in favor of the existence of local power to deal with local needs. *Whelan v. New Jersey Power and Light Co.*, 45 *N. J.* 237, 251 (1965).

*N. J. S. A.* 19:4–6, *par.* 1, provides that when, in any two consecutive elections in any election district, over 600 or less than 250 votes have been cast in counties other than counties of the first class, the governing body of the municipality may readjust the boundary lines of such election district or other election districts as may be necessary to effect the change, so that none of the election districts affected shall have more than 550 or less than 350 registered voters. For this purpose the governing body shall have power to consolidate any number of election districts and subdivide the same.

▮ *N. J. S. A.* 19:4–6, par. 3 provides that in redistricting election districts using voting machines, a like procedure may be followed, provided that in counties other than counties of the first class the municipal governing body shall upon notice from the county board redistrict the election districts in which voting machines are to be used.

The record shows that in two consecutive elections (1969 and 1970) over 600 votes were cast in most of Mountainside's election districts. Since Union County is a county of the second class and voting machines are used, *N. J. S. A.* 19:4–6, par. 3, applies. Paragraph 3 says that "a like procedure may be followed". The only logical and legal conclusion is that this refers to the procedure set out in paragraph 1 which gives the governing body the right to readjust the district lines so that election district affected shall have more than 550 or less than 350 registered voters. "A like procedure" means having the same qualities, or characteristics similar to or in the same manner, in following the mode of proceeding by which a legal right is enforced through the successful application of proper remedies. See *Webster's New Collegiate*

*Dictionary,* 487 (1960); *Black's Law Dictionary* (*3d ed.,* 1430).

Therefore, it is the opinion of this court that under *N. J. S. A.* 19:4–6 Mountainside had the authority to readjust the district boundary lines. As a result of the redistricting the following results were attained. District 1, 421 registered voters; District 2, 439; District 3, 453; District 4, 459; District 5, 426; District 6, 406; District 7, 418; District 8, 447; District 9, 442, and District 10, 427 registered voters. In no district are there more than 550 or less than 350 registered voters.

■ At oral argument the court raised the question of whether this procedure may be followed only upon notice from the county board of elections, which the statute provides for. The county board had not given the municipality notice to realign the districts. However, it is apparent that the county board acquiesced in the action of the mayor and the governing body of Mountainside and raised no objection. The record shows that the office of the clerk of the board of elections was duly notified by the governing body that the ordinance readjusting the election districts had been adopted; that a copy of the map of the newly established election districts was provided, and that on March 23, 1971 the clerk's office mailed to each registered voter in Mountainside a notice advising him of his new election district. There was substantial compliance with the statute.

*N. J. S. A.* 19:4–6 also states that in every district change or readjustment, geographical compactness shall be maintained and as nearly rectangular as possible. Plaintiffs contend that an examination of the map of the ten new election districts referred to in Ordinance No. 438–71 clearly shows that districts drawn violate the statutory requirement of geographical compactness and rectangular shape, and, therefore the ordinance is *ultra vires* and of no force and effect.

Defendants argue that the district lines were drawn with the intention of making the districts as nearly rectangular

as possible, and to keep the number of registered voters in each district as equal in number as possible; and that it was necessary in a number of instances for the district lines to follow the pattern of the street lines.

An examination of the map reveals that District 3 is anything but rectangular in shape. There seems to be a narrow bottleneck toward the center. However, the district seems to be somewhat wedged in by the Watchung Reservation on the north and the Town of Westfield on the south. The narrowest part of the borough is in the western section.

The proper construction and interpretation of *N. J. S. A.* 19:4–6 would seem to be that the governing body, in readjusting the boundary lines of the district so that there shall be no more than 550 nor less than 350 registered voters, shall maintain each district as nearly rectangular as possible. This does not make it mandatory that each district be rectangular — only that each district be maintained as nearly rectangular as possible. In *Black's Law Dictionary* (3*d. ed.*) 1385 the word "possible" is defined as "capable of existing or happening, feasible." The word does not mean probability, but denotes extreme improbability without excluding the idea of feasibility. Therefore, absent proof indicating an abuse of this power, this court holds that the redistricting was within the requirements of the statute. See *Stroud v. McCallen,* 53 *N. E.* 2d 422, 424, 425 (*Ill. Sup. Ct.* 1944).

The judiciary does not pass upon the wisdom of a municipal ordinance, nor does it nullify decisions of a governing body merely because there is disagreement as to the wisdom of municipal action, or a debatable issue has been presented. *Fred v. Mayor, etc. Old Tappan,* 10 *N. J.* 515 (1952).

Furthermore, factual support for local legislative action is presumed. Barring a showing *contra,* the assumption is that the measure has a rational basis within the knowledge and experience of municipal law makers. *Guill v. Mayor, etc., Hoboken,* 21 *N. J.* 574, 581 (1956).

■ The wisdom of legislative action is reviewable only at the polls. The judicial role is tightly circumscribed. We may act only if the presumption in favor of the ordinance is overcome by a clear showing that it is arbitrary or unreasonable. *Kozesnik v. Montgomery Tp.,* 24 *N. J.* 154, 167 (1957).

■ Assuming, *arguendo,* that *N. J. S. A.* 19 :4–6 did not give defendants the authority to redistrict the borough, it is certain that *N. J. S. A.* 19 :4–7 did. The latter statute provides, in substance, that where it appears that certain districts contain an unreasonably larger or smaller number of voters in comparison with others, the elective governing body of the municipality in counties other than counties of the first class may revise or readjust the election districts in the municipality without regard to whether a readjustment is authorized under *N. J. S. A.* 19 :4–6.

The ordinance provides that it was enacted pursuant to the authorization contained in *N. J. S. A.* 19 :4–6 *et seq.* This would include *N. J. S. A.* 19 :4–7. The dispute as to this is a question of form rather than a matter of substance. The ordinance also recites, "Whereas the pattern of population growth has resulted in a serious differential in comparative numbers of voters in the present election districts * * *." This complies with the provisions of *N. J. S. A.* 19 :4–7, which states that "Where it appears that * * * certain districts contain an unreasonably large or small number of voters in comparison with other districts."

The record of voters before the readjustment of the districts bears this out. For example, in 1969 District 1 had 714 registered voters; District 2 1,200; District 3 612; District 4, 1,009, and District 5, 1,004. There were 46 absentee ballots, making a total of 4,539 registered voters. The record for 1970 revealed the following: District 1, 681 registered voters; District 2, 1,166; District 3, 582; District 4, 964; District 5, 937; absentee ballots, 61 — making a total of 4,330.

A study of this record reveals that the pattern of population growth had resulted in a serious differential in the comparative number of voters in the election districts, and that certain districts contained an unreasonably large or small number of voters in comparison with other districts. For example, in 1970 District 2 had slightly more than twice as many voters as District 3, and approximately 58% more voters than District 1. Furthermore, Districts 4 and 5 each had more than 200 fewer voters than District 2. The 1969 figures reveal substantially the same discrepancies, with minor variations. These differentials are excessive and go beyond the rules of moderation.

Accordingly, it is the opinion of this court that the borough was justified in revising the election districts under the terms of *N. J. S. A.* 19 :4–7.

This decision seems to be consistent with *Formal Opinion 25,* issued in 1959 by the Attorney General in response to an inquiry from the Union County Board of Elections. The opinion advised that

* * * It is the spirit of *R. S.* 19 :4–7 that in counties other than counties of the first class, the elective governing body of the municipality should have exclusive jurisdiction over the entire question of drawing election district boundaries.

We understand that in the particular case with which you are concerned, the municipality is not in a first class county. Therefore, it is our opinion that in this case the responsibility for drawing the new election district boundaries rests with the elective governing body of the municipality.

Thus, *N. J. S. A.* 19 :4–7, under the circumstances set out therein, gives the elective governing body of a municipality the right and power to revise and readjust election districts without regard to whether a readjustment is authorized under *N. J. S. A.* 19 :4–6. It is therefore not necessary under the circumstances to consider the conditions laid down in 19 :4–6, including the condition that each district shall be maintained as nearly rectangular as possible.

Plaintiffs state that the ordinance gives no description of the proposed election districts except by reference to a

map that was not published in any newspaper circulated in Mountainside. They claim that since the map was never published with the ordinance, the voters were never given adequate notice of the actual effect of the redistricting. The map, they say, could easily have been printed with the ordinance in the *Mountainside Echo;* the notice that the map was available for inspection in the Borough Hall was insufficient publication and in violation of *N. J. S. A.* 40:49-2.

Defendants contend that there was an adequate publication of the proposed ordinance prior to its second reading and approval by the borough council.

█ The purpose of requiring publication prior to the adoption of an ordinance is to afford opportunity to the parties in interest and citizens to be heard on the subject matter. *Bruno v. Shrewsbury,* 2 *N. J. Super.* 550 (*Law Div.* 1949); *Masnick v. Mayor, etc. Cedar Grove Tp.,* 99 *N. J. Super.* 436 (*Law Div.* 1968). Defendants assert that this was accomplished, in that some 20 or 21 borough residents attended the public hearing, and at that time a letter from Robert Jaffe to the mayor and council was read objecting to the readjustment plan.

The ordinance provides in part as follows:

Now, therefore be it resolved, pursuant to authorization contained in *N. J. S. A.* 19:4-6 *et seq.,* that the Borough of Mountainside is hereby divided into ten election districts as the same are designated and delineated upon a certain map entitled "Map of Election Districts of the Borough of Mountainside, Union County, New Jersey, prepared by Robert Koser, P. E. and L. S., #12311, dated January 15, 1971." The said map is now on file in the Office of the Clerk of the Borough of Mountainside as a public record, and shall hereafter remain on file in said office.

█ The affidavit of the borough Clerk states that at all times Ordinance No. 435-71 was pending before the borough council, there was on file in his office and available for inspection by any interested member of the public a map entitled "Map of Election Districts of the Borough of Mountainside, County of Union and State of New Jersey," and

that said map remains on file in his office. The map referred to in the ordinance was therefore available for inspection in the office of the borough clerk.

Apparently there are no court decisions to be found in this State involving facts identical to those in this case. However, there are cases involving zoning ordinances which refer to a map on file but which was not incorporated in the body of the ordinance.

*Burmore v. Smith,* 124 *N. J. L.* 541 (*E. & A.* 1940), held that there is no statutory requirement that the map be published. The court went on to state:

> But be that as it may, the ordinance does state, as we have already seen, that the boundaries of each district or zone created are in fact established on the map filed wtih the city clerk. True the usual practice is to state that the map is made part of the ordinance, but we think it is quite clear, from the language used, that the map was intended to be and is in fact by reference made part of the ordinance. The copy of the map submitted to us, and undoubtedly available as an official record to all in interest, is free from any uncertainty. [at 546]

The court noted that in *State v. Morristown,* 34 *N. J. L.* 445, the (former) Supreme Court was called upon to review two ordinances establishing street grade lines. The validity was attacked upon the ground of uncertainty, in that (among other things) both merely referred to a map on file:

> Mr. Justice Depue, speaking for the Court, said (at *page* 447): "The adoption of grade lines by ordinance, by reference to maps and profiles, is the usual, and indeed the only practical means of legislating on the subject."

The *Burmore* court observed that this pronouncement stood unchallenged; that in all reason, it applies with equal efficacy to the adoption of a zoning ordinance, citing *cf. Willets v. Sea Girl,* 8 *N. J. Misc.* 479; 150 *A.* 777 (Sup. Ct. 1930); 62 *C. J. S. Municipal Corporations* § 427, page

819. The court also said that it was satisfied that the ordinance was certain and properly published.

In *Slattery v. Caldwell Tp.,* 79 *N. J. Super.* 591 (Law Div. 1963), the court held that district boundary lines can be established by inclusion in the zoning ordinance of a map setting forth the lines. The boundaries may also be set by reference to a map not attached or made part of the ordinance, but referred to in the ordinance. However, the court held the ordinance under review invalid because it did not comply with the above standards, and this was affirmed in 83 *N. J. Super.* 317 (*App. Div.* 1964), where the court recited the same principle of law.

Therefore, it appears that the publication of this ordinance here in question was not in violation of *N. J. S. A.* 40:49–2, which contains no more detailed requisites for publication than in the case of zoning ordinance, *N. J. S. A.* 40:55–34.

Plaintiffs also argue that the increase in the number of districts to ten will involve unnecessary expense for the purchase of two additional voting machines and additional poll workers and officials. However, it is apparent that plaintiffs speak without knowledge. Their claim is refuted by the affidavit of the Union County Board of Elections clerk in which he states that because of the size of the pool of voting machines maintained by the county election board and the number of machines employed in Mountainside prior to the readjustment of voting districts, the readjustment of those districts will not require the purchase of additional voting machines. He further states that if there is any requirement for additional workers supplied by the county Election board, the cost entailed will be nominal.

Only one voting machine per district will be used because of the reduced number of voters in each district. This is the common practice in Union County. A check of the records reveals that there were 412 election districts in the county at the 1970 primary, and of those only 29 used more

than one voting machine. On Election Day 1970, 64 of the 412 used more than one voting machine, but this occurred only in districts having between 750 and 800 registered voters. All of the realigned districts in Mountainside have less than 500 registered voters.

There is no evidence that this realignment will increase the total number of registered voters in Mountainside by adding any ineligible registered voters or by subtracting eligible voters from the total number. There is no proof that any qualified voter has been or will be deprived of his right to vote, or that anyone who is not entitled to vote will be permitted to vote as a result of the realignment. There is no proof that anyone will be permitted to vote in a district where he is not legally a resident.

Plaintiffs motion for summary judgment will be denied and defendants' motion for summary judgment granted.